541 P.2d 634

STATE of New Mexico, Plaintiff-Appellee,

v.

Trinidad C. DE BACA, Defendant-Appellant.

No. 2132.

Court of Appeals of New Mexico.

Sept. 30, 1975.

Certiorari Denied Oct. 27, 1975.

Jerome M. Ginsburg, Santa Fe, for defendant-appellant.

Toney Anaya, Atty. Gen., Mark Shoesmith, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

HENDLEY, Judge.

This is an interlocutory appeal following the denial of defendant's motion to dismiss the indictment against him on double jeopardy grounds. We reverse.

Defendant was indicted for burglary, contrary to § 40A–16–3, N.M.S.A.1953 (2d Repl.Vol. 6, 1972). He was brought to trial on June 2, 1975. The trial lasted two days during which time both the state and the defendant presented evidence and rested their cases. Jury instructions had been settled. On the morning of the third day, one of the jurors, Mrs. Alice Naranjo, brought to the attention of the court, in the presence of counsel, that her sister-in-

law had received a phone call from an unidentified man who had asked questions relating to Juror Naranjo's feelings about drug abuse. The phone call placed Juror Naranjo in an extreme state of fear and apprehension. After a discussion which included an attempt to allay Juror Naranjo's fears, an attempt to discover the perpetrator of the phone call and an inquiry into the propriety of a cautionary instruction, the trial court abruptly declared a mistrial. No objection was made to this action by either the defendant or the state. No alternate juror was available.

We quote extensively from the transcript of proceedings in the trial court's chambers in order to clarify the issues on this appeal:

"THE COURT: Let the record show that the court is meeting with counsel in chambers outside the presence of the jury and the court has just been handed a note from Mrs. Alice Naranjo, wherein it states that the juror Alice Naranjo received a telephone call yesterday. Mrs. Naranjo[,] Counsel are present and I wonder if you could explain to this just briefly what happened.

"MRS. ALICE NARANJO: Well, I didn't get the telephone call, my sister-in-law received the call yesterday morning about ten o'clock and she said the person hadn't identified himself or she didn't get the name.

"THE COURT: She didn't ask his?

"MRS. NARANJO: It was a man's voice; a man's voice and he said, he asked her if I had ever been convicted of a felony, if I have ever been in prison and he asked her if, how I felt about drug abuse and if I had ever been on drugs myself and if I knew anybody that had been on drugs. And I think she said he mentioned if I knew about the case they were working on for drug abuse or somebody that had been on drugs and was going to be tried on the trial on drugs or something. And he asked her if I was ever to testify against her like if she had been using drugs, if I was to

testify that I knew that she had been using drugs and that if I was to be able to give a fair and impartial opinion about her since she was my sister-in-law. And they asked if I was ever capable of lying on the jury if anybody was to come up and ask me, but I don't know if they meant if they were to pay me if I would lie or if I would lie just for my ownself being you know for my own [consciousness] to save myself, you know. And that was about all that she could remember that he told her.

"* * *

"THE COURT: Mrs. Naranjo, I want to thank you for reporting this matter to the court as the court instructed you and the other jurors at the outset if you did receive any communications about the case, the appropriate thing to do is just as you have done, is to report it. Now, let me just state to you Mrs. Naranjo that this should have no bearing whatsoever upon your verdict as a juror.

"MRS. NARANJO: Oh, yes I understand.

"THE COURT: And you should set this aside and any consideration of the matters that will be presented the jury to consider and you should be fair and impartial to both the State and the Defense and this should not in any manner influence your verdict either for or against the State or the Defense.

"MRS. NARANJO: Yes, I understand that.

"THE COURT: And I would request and direct that you carefully follow the instructions that the court will read you and your consideration of the matters that will be presented to the jury to disregard this and in no way allow it to influence your verdict and either for or against either party.

"* * *

"THE COURT: * * * [A]t this time I will ask that you not discuss the matters with the other jurors and you can return then to the jury room where the other jurors are waiting.

"MRS. NARANJO: Is it customary though for lawyers before a case is coming up that they have a listing of all jurors, do they investigate sometimes so that they can have an impartial jury?

"THE COURT: It is not an uncommon practice for either the State or Defense or even in several cases for an attorney to make a check of the jurors to find out something about them so that it will help them evaluate the matters and this is customary practice. It is followed not only in this district but throughout the state and nation and it in no way indicates any intention on either or any of the parties to in any way influence the verdict of jurors or individual jurors. It's simply a matter that allows the attorney to find out something about the individual juror that may not be contained in the questionaire [sic]. Thank you very much.

"MRS. NARANJO: Well, what would happen, well, like my husband works nights and sometimes if anybody were to go to my house?

"THE COURT: Well, you would have the right to inform the authorities and no one has the right to go to your home without your permission.

"MRS. NARANJO: They can contact you by phone but they can't go to your house and ask you direct questions like that.

"THE COURT: That is correct.

"MRS. NARANJO: Okay.

"THE COURT: Thank you again.

"(WHEREUPON MRS. NARANJO WENT BACK TO THE JURY ROOM AND THE FOLLOWING PROCEEDINGS WERE CONTINUED IN THE JUDGE'S CHAMBERS)

"THE COURT: * * * Now, I would like to get to the bottom of this gentlemen. * * *

"MR. BUDAGHER: Your Honor, the State hasn't contacted anyone nor would we do that.

"MR. GINSBURG: [Defense Counsel] I haven't contacted them but I think from what she said, I have a feeling that it was the Public Defender's Office because I know they have a drug case coming up * * *.

"* * *

"THE COURT: Then gentlemen, I feel in light of the matters that have been disclosed to the court by Mrs. Naranjo, that an appropriate precautionary instruction should be given to the jury regarding inquires [sic] made by counsel prior to the case. From what has been related to the court, it appears that perhaps the Public Defender's Office not incident to this case but to another jury case which is pending on the court's docket which will be brought to trial in a couple of days and it appearing that the Public Defender's Office is in the process of inquiring of neighbors or friends of prospective jurors on the jury panel here in Santa Fe County of certain information about the members on the panel and it appears that this is the type of information that must have been communicated to Mrs. Naranjo. I do feel in order to negate any possible problems either to the State or the Defense, that an additional precautionary instruction be given to the entire jury.

"(WHEREUPON A SHORT RECESS WAS HELD AT THIS POINT)

"(WHEREUPON THE FOLLOWING PROCEEDINGS WERE CONTINUED IN CHAMBERS)

"THE COURT: [After summarizing the proceedings until now, the court asked certain members of the Public Defender's trial staff for explanation.]

"* * *

"MR. SCHMIDT: [Public Defender]: Two people whom I know who are doing investigative work on jury investigation was Mr. Delgado and we have a law clerk Bill Lazar and he was specifically inquiring about Mrs. Naranjo and he found out

she worked at La Posada and he told me this morning—

"THE COURT: About the juror Alice Naranjo[?]

"MR. SCHMIDT: He was assigned to her and I don't know for sure if it was this juror but it was on jury investigation but we assign the jury investigations to Mr. Delgado and Bill Lazar I think was assigned to Mrs. Naranjo and he told me this morning that he had talked to her employer at the La Posada yesterday and had talked to that particular person who she worked with and that is all he told me about what he found out.

"THE COURT: Well, gentlemen, what concerns the court is that this juror communicated this matter to the court and this juror was in tears and I feel that I am going to have to declare a mistrial on this case. The juror was obviously from her appearance extremely upset and frightened and she made the statement to the court about what would happen if someone involved in a drug program would come to 'my home' and whatever has been communicated to her has been in such a manner that this juror was in extreme state of fear and she had tears in both her eyes and I don't think in fairness to the Defendant in this case, which apparently has not been any doing on part of the Defense counsel or the State in this case whatever has been done has been done in such a manner as to place this particular juror in an extreme state of apprehension. I am going to declare a mistrial on this case. * * * [I]t is obvious to the court that this would not be fair either to her or to other members of the jury to go on. * * *"

Retrial was set for July 17, 1975. Defendant, thereafter, moved to dismiss the indictment on the grounds that there was no manifest necessity for the declaration of the mistrial, there was no adequate exploration of alternatives to mistrial and the ends of public justice were not served by the declaration of mistrial, all of which lead to the conclusion that retrial of the defendant would place him twice in jeopardy contrary to the provisions of the United States Constitution, the New Mexico Constitution and § 40A–1–10, N.M.S.A. 1953 (2d Repl.Vol. 6, 1972) which states:

". . . Double jeopardy.—No person shall be twice put in jeopardy for the same crime. The defense of double jeopardy may not be waived and may be raised by the accused at any stage of a criminal prosecution, either before or after judgment. When the indictment, information or complaint charges different crimes or different degrees of the same crime and a new trial is granted the accused, he may not again be tried for a crime or degree of the crime greater than the one of which he was originally convicted."

The motion was denied and we granted defendant's application for interlocutory appeal pursuant to § 21–10–2.1, N.M.S.A. 1953 (Repl.Vol. 4, 1970, Supp.1973).

For a century and a half, the touchstone for determining whether a defendant will be placed in double jeopardy following the declaration of a mistrial has been found in the following language of the case of *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824):

" * * * [T]he law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; * * *."

*State v. Sedillo* (Ct.App.), 88 N.M. 240, 539 P.2d 630, decided July 16, 1975, held that upon appellant review the question was whether the trial court exercised a sound

discretion to ascertain that there was a manifest necessity for the declaration of a mistrial. In *State v. Sedillo,* supra, the factor precipitating the declaration of the mistrial was one instance of misconduct by defendant's counsel, fairly able to be characterized as evidentiary irregularity, which could be cured by an appropriate cautionary instruction. In the instant case, the irregularity concerned the possibility of a verdict by a jury that was less than impartial or less than rational. As the cases in this area defy meaningful categorization, see *Illinois v. Somerville,* 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), we enumerate the factors to be taken into consideration in determining whether a defendant's retrial will place him in double jeopardy after a prior trial has been aborted by the declaration of a mistrial not at his request.

First is defendant's interest in having his fate determined by the jury first impaneled. *Illinois v. Somerville,* supra. This not only encompasses defendant's right to have his trial completed by a particular panel, see *Wade v. Hunter,* 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949), but also his interest in ending the dispute then and there with an acquittal. See *United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547, 27 L. Ed.2d 543 (1971). This factor would weigh heavily against retrial in all situations where jeopardy has attached, i. e. after the jury is sworn to try the case. See *State v. Moreno,* 69 N.M. 113, 364 P.2d 594 (1961).

Related to this is the factor of avoiding giving the state a second bite of the apple in order to either strengthen its case *(Downum v. United States,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963) ) or to alter its trial strategy to obtain a conviction. See *United States v. Kin Ping Cheung,* 485 F.2d 689 (5th Cir. 1973). We are unable to tell how much this factor is applicable in the instant case because there has been no retrial.

To be balanced against these weighty interests of the defendant are the two considerations outlined in *United States v.*

*Perez,* supra: (1) that there is a manifest necessity for the discharge of the first jury or (2) that the ends of public justice would be defeated by carrying the first trial to final verdict. When the irregularity occurring at trial is of a procedural nature, not rising to the level of jurisdictional error, the necessity to discharge the jury has been held to be not manifest. Compare *State v. Sedillo,* supra, with *Illinois v. Somerville,* supra. However, where the irregularity involves possible partiality within the jury, it has been more often held that the public interest in fair verdicts outweighs defendant's interest in obtaining a verdict by his first choice of jury. *Thompson v. United States,* 155 U.S. 271, 15 S.Ct. 73, 39 L.Ed. 146 (1894); *Simmons v. United States,* 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 968 (1891); *Whitfield v. Warden of Maryland House of Corrections,* 486 F.2d 1118 (4th Cir. 1973); *Smith v. Mississippi,* 478 F.2d 88 (5th Cir. 1973). And such has been the case even where defendant did not object to a jury where the victim's father was the tipstaff [jury attendant] who was serving the jury. *Commonwealth v. Stewart,* 456 Pa. 447, 317 A.2d 616 (1974), cert. denied, 417 U.S. 949, 94 S.Ct. 3078, 41 L.Ed.2d 670 (1974).

The state asserts that where a continuation of the trial would make reversal on appeal a certainty then a manifest necessity to declare a mistrial existed. *Illinois v. Somerville,* supra. Although we may agree with this statement the record in this case does not indicate a certainty of reversal on appeal. The state would also have us hold that when the judge determines possible bias on the part of a juror, manifest necessity for declaring a mistrial exists. Assuming a possibility of juror bias provides sufficient grounds for declaring a mistrial, the record in this case does not show such a possibility. Juror Naranjo was frightened by the telephone call. The record does not show that the juror's fear involved either the state or the defendant in this case. The record does show that juror Naranjo understood that

the phone call was not to influence her deliberations in this case. The record does not show a manifest necessity and does not show that it was in the ends of public justice to declare a mistrial.

Having decided there was no showing of a manifest necessity for declaring a mistrial we discuss the possible alternatives the trial court should have used before declaring a mistrial. The cases are not clear as to what kind or how much of an inquiry into alternatives is necessary but the trial court clearly has some duty to so inquire. See *United States v. Jorn,* supra. Affecting the scope of inquiry required are the factors of magnitude of prejudice and the point at which the proceedings are terminated. As the magnitude of possible prejudice increases, we would expect less effort to be expended in seeking alternative resolutions. Conversely, as the length of trial wears on, we would expect more effort to be expended.

Two cases shed much light on these matters. They are *United States ex rel. Russo v. Superior Court of New Jersey, etc.,* 483 F.2d 7 (3rd Cir. 1973), cert. den., 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973) and *United States v. Holland,* 378 F.Supp. 144 (E.D.Pa.1974). Both cases deal with a trial court's response to a jury that had possibly become unable to render the sort of fair and impartial verdict that public justice demands. The cases are instructive because they represent opposite ends of the spectrum of what a trial court can do in such a situation.

In *Russo,* there was a nine day murder trial in which credibility of the witnesses was a key question for the jury. After they had deliberated for one entire day, the jury sent out a note indicating that they were far from reaching a verdict. The trial court told them that time was no problem and had them spend the night in a motel. The next day they requested certain testimony to be read back. This was done and they deliberated for several hours more. At mid-afternoon of this second day of deliberations, the court called the jury back and declared a mistrial because he noticed that the jurors were walking wearily and he felt it would be unfair to both parties for a unanimous verdict to be arrived at because of the exhaustion of the members of the panel. In spite of the fact that the trial court took its action in order to obtain a fair verdict for both parties and in spite of the fact that the trial court had the jury in its presence, the appeals court found that defendant's second trial placed him in double jeopardy.

*Holland* was a seven day trial at which the jurors commenced deliberations at 5:00 p.m. of the last day. The next morning, during the jury's coffee break, one juror requested to be excused because the emotional burden of "condemning" someone was such that she as a "Christian," "could not take." Shortly thereafter, the court received word that the particular juror had fainted. A doctor was summoned and after ministering to the juror, he testified before the trial court. In his opinion, the juror was in a state of acute hysteria and incapable of carrying out her duties as a juror lest she be "tipped over into . . . a psychotic state." An employee in the building who was acting as a matron to the juror testified as to the juror's emotional state. A psychologist, who had listened to the testimony of the doctor and the matron, testified that the effect of ordering the juror to continue deliberations would likely produce more pathology, not limited to just fainting. Although there appeared to be no question but that the juror could not continue, the trial court, nevertheless, insisted upon meeting with the juror and putting her through an extensive interrogation as to whether or not she would be able to perform her "civil duty." She repeatedly replied in the negative and the court told her to go home for the evening and think it over. She returned the next day and steadfastly refused to continue deliberating. At that juncture, the trial court, believing that the greatest caution under the circumstances had been exercised and that the ends of justice would be disserved by

continuation of the proceedings, declared a mistrial.

We believe that the facts of the instant case more closely approximate those in *Russo* than those in *Holland*. Although this trial lasted substantially less than one week, both sides had gone through considerable expense and effort in presenting their cases in their entirety. Thus the factor of point at which trial is terminated weighs heavily against the declaration of a mistrial.

The magnitude of apparent prejudice to either side seems particularly low in the instant case. Juror Naranjo appeared to recognize that the phone call was unrelated to the case she was to be deciding and she said that it would not influence her verdict in any way. In terms of alternatives, defendant in his brief, suggests the giving of a cautionary instruction, submitting the case to an eleven person jury and bringing the person who made the call before Juror Naranjo to allay any apprehension she may have had. We decline to say that the trial court should have made use of one of the suggested alternatives. We believe that it is enough that he explore them. It is commendable that the trial court did discuss the propriety of a cautionary instruction. However, there is nothing of record to indicate why such an instruction was rejected as inadequate. The record reflects that the declaration of the mistrial came without any advance warning.

While we would not require of the trial court a detailed record of each alternative explored and the reasons for rejecting each one and while we believe that the trial court's action in *Holland* represents the "exercise of great caution" in the extreme, we feel that the trial court in the instant case failed to exercise that sound discretion required of him in determining whether a manifest necessity or proper judicial administration mandated a mistrial.

The order of the trial court denying defendant's motion and setting a date for retrial is accordingly reversed and defendant is ordered discharged.

It is so ordered.

WOOD, C. J., and HERNANDEZ, J., concur.