797 P.2d 306

**STATE of New Mexico,
Plaintiff–Appellee,**

**v.**

**Steve HAAR, Defendant–Appellant.**

**No. 10833.**

Court of Appeals of New Mexico.

June 26, 1990.

Certiorari Denied Aug. 6, 1990.

Hal Stratton, Atty. Gen., Bill Primm, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Jacquelyn Robins, Chief Public Defender, Jerry Todd Wertheim, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

## OPINION

APODACA, Judge.

This court filed an opinion April 3, 1990, affirming defendant's conviction. Defendant filed a motion for rehearing, urging this court to reconsider our decision in light of *State v. Wilson*, 109 N.M. 541, 787 P.2d 821 (1990). We have done so, and, because we find *Wilson* distinguishable, we affirm. We withdraw our earlier opinion and substitute this opinion in its place.

Defendant appeals his jury conviction of criminal damage to property over $1,000. He raises five issues on appeal: (1) whether there was substantial evidence that the value of property damaged was at least $1,000; (2) whether there was substantial evidence that defendant had the requisite intent under the subject statute; (3) whether pre-indictment delay or time lapse before trial warranted dismissal with prejudice; (4) whether the trial court's communication with a juror, outside defendant's presence, and juror's subsequent excusal, constituted reversible error; and (5) whether the results of a warrantless test firing of a weapon, lawfully in police custody, should have been suppressed. Other issues listed in the docketing statement but not briefed are deemed abandoned. *State v. Fish*, 102 N.M. 775, 701 P.2d 374 (Ct.App.1985). We decide all issues against defendant and therefore affirm his conviction.

On December 10, 1986, police investigated a report that shots had been fired at a vehicle and residence owned by Marcy Sandoval, a police officer. Shell casings and projectiles were found at the scene of the shooting. Three days later, defendant was arrested on a felony bench warrant and

misdemeanor charges, both unrelated to the shooting incident. A search incident to the arrest resulted in the seizure of two handguns, which were tagged as evidence. The arresting officer informed Sandoval of defendant's arrest and the seizure of the weapons. Sandoval reported to police that she considered defendant a possible suspect in the shooting at her house. She explained she had taken a felony assault report concerning defendant at his ex-girlfriend's house, located two blocks from Sandoval's residence. She also stated that her conspicuously marked patrol car was often parked in her driveway.

An investigator ordered a test to be performed to compare one of the guns taken from defendant with the evidence recovered at Sandoval's residence. The test established that defendant's gun had discharged four casings and one projectile found at the crime scene. The bullets were full jacketed with a metal alloy, which enabled them to penetrate further and faster than other bullets. Over defendant's objections, evidence of the test results was later admitted at trial.

During the next five months preceding defendant's trial, plea bargaining discussions took place on the charges leading to defendant's arrest, as well as the incident at Sandoval's house. In May 1987, a plea bargain disposed of the previous charges only, and in July 1987, defendant was indicted on three counts of aggravated assault in connection with the shooting incident. The July indictment did not include a criminal damage charge. In February 1988, the state *nolle prosequid* the assault charges and indicted defendant on the criminal damage charge. Trial on this charge commenced in May 1988.

At trial, Sandoval offered the following testimony on damages: car interior, $368.37; car exterior including gas tank, $465.84; wall repairs, $65.33; and dishwasher replacement, $100, for total damages of $1,009.54. She testified that the amount for wall repairs represented materials she purchased to repair the walls herself, but did not include her labor. She stated that shots had rendered the dish-

washer unusable and that she had purchased it from a private party for $110. Written estimates for repairs of the vehicle were introduced into evidence to support Sandoval's testimony.

Sometime before jury deliberations began, a juror was approached during a five-day trial recess by a woman who may have been trying to influence the juror by claiming defendant was being "railroaded for shooting up the policeman's car." The juror promptly reported this contact to the trial judge before trial resumed. The judge met with both counsel in chambers, reported the communication and recommended that the juror be excused. Counsel for the state did not object. Defendant's counsel took no position but noted defendant's absence. The excused juror was replaced with an alternate. We discuss each issue separately.

## EVIDENCE OF DAMAGE

■ The statutory minimum for criminal damage to property is $1,000. NMSA 1978, § 30–15–1 (Repl.Pamp.1984). Relying on *State v. Seward*, 104 N.M. 548, 724 P.2d 756 (Ct.App.1986), defendant contends Sandoval's testimony with respect to the dishwasher damage was speculative and thus did not support an inference that it amounted to $110. The dishwasher's value is critical since Sandoval's testimony on damage was only $9.54 above the minimum of $1,000.

*Seward* is distinguishable, however. There, this court was concerned not by valuations furnished by the victim, but rather with the lack of testimony on value. The victim in *Seward* testified that four items were missing, that the value of two of those items was $2,075 and that the value of all items *damaged and* taken was $4,000. The jury had to guess that the value of the items taken, in addition to the two identified, was sufficient to make up the $425 needed to support a conviction for larceny over $2,500. Here, Sandoval specifically stated the value of the dishwasher. Such evidence did not require an inference based on conjecture or speculation.

Nor are we concerned that Sandoval, as owner of the damaged dishwasher, testified

as to its value. We have held that an owner of personal property may testify concerning the value of his property and that such testimony is sufficient to support a jury's determination of value. *See State v. Dominguez*, 91 N.M. 296, 573 P.2d 230 (Ct.App.1977). An "owner necessarily knows something about the quality, cost, and condition of his or her property and consequently knows approximately what it is worth." *State v. Hughes*, 108 N.M. 143, 146, 767 P.2d 382, 385 (Ct.App.1988).

Defendant suggests Sandoval may have misstated the amount of damages in order to meet the statutory minimum. However, the jury was free to draw other inferences from the victim's testimony. *State v. Vigil*, 87 N.M. 345, 533 P.2d 578 (1975). For example, Sandoval did not testify on the value of her labor in repairing holes caused by the shots, nor did she claim the replacement value of a new dishwasher. She also did not assign any value to the damage done to the garage doors. From this evidence, the jury could have inferred that Sandoval's testimony on value was truthful and not an overestimate. As a general rule the market value of property damaged by another is a question of fact for the jury. *See Tunnell v. State*, 99 N.M. 446, 659 P.2d 898 (1983). We conclude the evidence was sufficient to support an inference that damages were at least $1,000.

## EVIDENCE OF INTENT

Under this issue, defendant compares the pertinent statute with those of other states. He argues that those states proscribing reckless or negligent damage differentiate those crimes by requiring malice or intent to cause damage to property as a basis for establishing culpability when "intentionally" damaging property is prohibited. To the extent that defendant is suggesting more is required than an intention to do the act causing damage, we disagree. Since the subject statute describes a particular act, without regard to intent to do anything further, all that is required is a general intent to do the proscribed act. *See State v. Beach*, 102 N.M. 642, 699 P.2d 115 (1985).

Defendant also relies on *State v. Vogenthaler*, 89 N.M. 150, 548 P.2d 112 (Ct.App. 1976), to argue that the subject statute here requires a specific intent. In *Vogenthaler*, this court discussed the difference between NMSA 1953, Repl.Vol. 2 (1972), Section 40A–15–1 (Supp.1975) (the predecessor to NMSA 1978, Section 30–15–1 (Repl.Pamp.1987)) and NMSA 1953, Repl. Vol. 2 (1972), Section 40A–15–3 (Supp.1975) (predecessor to NMSA 1978, Section 30–15–4 (Repl.Pamp.1987)). Defendant there argued that Section 40A–15–3, proscribing the desecration of a church, violated equal protection of the law. The basis for this contention was that, under the statute, damage to a church under $1,000 was a misdemeanor, while criminal damage to other, non-church property of the same amount was only a petty misdemeanor. *Vogenthaler* noted that the elements of the offenses differed. Violation of Section 40A–15–1 required only intentional damage, while Section 40A–15–3 required that the defacement be willful, malicious, and intentional. We conclude that Section 30–15–1 requires general intent to do the act causing the damage and no more.

We next address the sufficiency of the evidence on what we have determined is the requisite intent. Defendant was not placed at the scene by an eyewitness. Nonetheless, his intent to commit the crime can be proved by reasonable inferences and sufficient direct or circumstantial facts, in which case we will not reweigh the jury's determination. *State v. Jennings*, 102 N.M. 89, 691 P.2d 882 (Ct. App.1984). We believe the circumstantial evidence of defendant's intent was substantial. Several days after an unidentified person fired five shots from a 9mm semiautomatic gun into the victim's home and a vehicle parked there, defendant was arrested. A 9mm semiautomatic pistol was seized at that time. A police expert positively traced the spent casings and one projectile to defendant's handgun. Considering the number of shots fired and the fact that the bullets were full jacketed with a copper alloy to allow for greater penetration and velocity than other bullets, suggests defendant took steps to insure

that the shots fired would cause damage. Viewing the evidence in the light most favorable to the jury's verdict, as we must, and allowing all reasonable inferences in support of the verdict, we conclude there was substantial evidence from which the jury could reasonably infer that defendant intentionally damaged the victim's property. *See State v. Brown*, 100 N.M. 726, 676 P.2d 253 (1984).

## PRE–INDICTMENT DELAY AND RIGHT TO SPEEDY TRIAL

 The requirements for a due process claim of pre-indictment delay were clearly noted in *State v. Grissom*, 106 N.M. 555, 746 P.2d 661 (Ct.App.1987). A defendant has the burden of demonstrating actual prejudice by specifically establishing how his defense would have been more successful had the delay been shorter. *Id.* Once that burden has been met, the court must balance the actual prejudice against the prosecution's reasons for delay to determine if there has been substantial prejudice. *Id.* Since defendant has not shown how his defense would have benefitted from a shorter pre-indictment period, we hold he has failed to establish a fourteenth amendment claim of pre-indictment delay. *See id.*

 We next consider defendant's sixth amendment speedy trial claim, which his brief intertwined with his due process argument. We are required to balance four factors to resolve a sixth amendment speedy trial claim: length of delay; reason for delay; assertion of the constitutional right to a speedy trial; and prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *State v. Tartaglia*, 108 N.M. 411, 773 P.2d 356 (Ct.App.1989).

 The length of delay is measured from the time of either charge or arrest. *United States v. Marion*, 404 U.S.. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Defendant argues his speedy trial rights were triggered by his arrest in December 1986, despite the fact that his arrest was on charges stemming from an unrelated incident. Seizure of a weapon incident to arrest only made him a *suspect* in the charges that were eventually filed as a result of the shooting at Sandoval's residence. Defendant contends alternatively that the triggering event was the indictment filed against him on aggravated assault charges in July 1987. We disagree that either of these events triggered defendant's speedy trial rights. At neither of these two events was he accused of, or held to answer to, the charge of criminal damage to property, a prerequisite under *Marion*.

Defendant was first "accused" of criminal damage to property under the indictment in February 1988, and he was tried in May, three months later. We believe such a delay cannot give rise to a speedy trial claim in view of the six-month time limit on commencement of criminal trials under SCRA 1986, 5–604. The six-month rule expresses the policy of our supreme court with respect to an acceptable length of delay. *State v. Mascarenas*, 84 N.M. 153, 154, 500 P.2d 438, 439 (Ct.App.1972). We conclude that the delay was not presumptively prejudicial. Since defendant has not demonstrated the delay period was presumptively prejudicial, we need not continue the analysis under *Barker* or *Tartaglia*. *See State v. Lucero*, 108 N.M. 548, 775 P.2d 750 (Ct.App.1989) (favored dismissal because second complaint did not contain any new facts or charges).

## COMMUNICATION WITH AND DISMISSAL OF JUROR

 Defendant next claims the trial court committed reversible error by communicating with and excusing a juror outside his presence. He relies on *Hovey v. State*, 104 N.M. 667, 726 P.2d 344 (1986), arguing that he had a right to be present during the communication. Defendant contends denial of that right raised a presumption of prejudice. In *Hovey*, the trial court, outside the presence of the defendant, responded to questions posed by the jury during its deliberations. In this appeal, the juror was excused and replaced with an alternate before deliberations began. The potential for abuse found in *Hovey* was not

present here, since the excused juror did not have an effect on the verdict.

█ We believe that *State v. Henry,* 101 N.M. 277, 681 P.2d 62 (Ct.App.1984), which involved a trial court's ex parte conversations with prospective jurors who did not serve on defendant's jury, is more akin to this appeal than *Hovey.* In *Henry,* we held that the procedure employed by the trial court was invited by defense counsel and did not prejudice the defendant. Here, the juror reported the influence attempt promptly to the trial court before the trial resumed. As a result, she was excused, and an alternate replaced her. The presumption of error is overcome if the communication is harmless. *State v. Gutierrez,* 78 N.M. 529, 433 P.2d 508 (Ct.App. 1967). We thus hold that, if there was any error in conversing with the juror in the absence of defendant, it was harmless. *See State v. Ramming,* 106 N.M. 42, 738 P.2d 914 (Ct.App.), *cert. denied,* 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987).

█ In granting defendant's motion for rehearing, we acknowledged that our supreme court, in *Wilson,* determined that the potential for abuse found in *Hovey* from a trial judge's communication with a juror was not limited to those instances in which the communication occurred during deliberations. Nonetheless, we believe that the reasoning in *Wilson* does not require us to conclude that the trial court committed reversible error by communicating with a juror outside of defendant's presence.

*Wilson* acknowledged that not every instance of communication between judge and juror during trial outside of a defendant's presence was reversible error. *See State v. Ramming.* This court's decision in *Ramming* was neither criticized nor expressly overruled by *Wilson.* Additionally, the supreme court's analysis of the hypothetical example in *Wilson,* suggests that restrictions on the application of *Hovey* is not limited to those instances in which the communication was not about an issue of the case. Prejudice to a defendant is also required for there to be reversible error. In this case, the trial court reported its contact with the juror to counsel. Both counsel participated in the decision to dismiss the tainted juror. Thus, defendant was afforded meaningful input and participation before dismissal of the juror. *See id.,* 109 N.M. at 548, 787 P.2d at 828 (Ransom, J., specially concurring).

*Wilson* is distinguishable in one other respect. We do not interpret that case as holding that the trial court's communication with the juror, by itself, was reversible error. Instead, we believe the supreme court's reversal in *Wilson* was based on what it concluded was cumulative error. We do not understand the supreme court as singling out the juror communication as the sole basis for reversal. Since there was no cumulative error in this appeal, *Wilson* is not applicable precedent. *See State v. Scott,* 90 N.M. 256, 561 P.2d 1349 (Ct.App.1977), *cert. denied,* 90 N.M. 637, 567 P.2d 486 (1977).

█ Also, it is not clear from the record before us that the issue of the judge's error in communicating with the juror was preserved. *See State v. Lopez,* 84 N.M. 805, 508 P.2d 1292 (1973) (motion or objection required to alert the mind of the trial court to the claimed error). Defendant's counsel did not object to the communication when he was informed of it by the trial court, although he did note defendant's absence. If defendant had been summoned at that point and had been advised of what the juror had said, thus effectively satisfying the objection, the judge's decision to exclude the juror would have been the same. In fact, in view of the juror's belief that someone may have been trying to influence her on defendant's behalf, it might have been prejudicial error if the trial court had *not* dismissed the juror. It thus appears to us that the trial court had no other choice and that defendant's presence would not have mattered.

█ Additionally, defendant did not show bias or prejudice, or that he did not get a fair trial. *See State v. Smith,* 76 N.M. 477, 416 P.2d 146 (1966) (defendant unsuccessfully argued trial court erred in not refilling places of jurors who had been excused after summoning and before im-

paneling where there was no evidence that any juror was biased or prejudiced). Defendant also claims he had a right to have the first twelve jurors chosen as the panel to decide the case, relying on *State v. De Baca*, 88 N.M. 454, 541 P.2d 634 (Ct.App. 1975). In *De Baca*, however, this court concluded that double jeopardy considerations mandated dismissal. *De Baca* balanced defendant's interest in having his fate determined by the first jury impaneled and his interest in obtaining an acquittal against requirements of manifest necessity for discharge of the first jury or preservation of the ends of public justice by carrying the first trial to a final verdict. *See United States v. Perez*, 22 U.S. (9 Wheat) 579, 6 L.Ed. 165 (1824). Here, only *one juror* was excused and replaced by an alternate. Defendant was thus tried by the same jury, and double jeopardy considerations never came into play.

### WARRANTLESS TEST FIRING

■ Defendant finally argues that the test firing of the pistol taken from him constituted a warrantless search, requiring suppression of the test results. We believe the threshold question in addressing this contention is whether a person may have a reasonable expectation of privacy in the identifying characteristics of a handgun.

New Mexico has no reported cases on this question, but courts in other jurisdictions have addressed the issue. In *State v. Zagorski*, 701 S.W.2d 808 (Tenn.1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3309, 92 L.Ed.2d 722 (1986), the defendant insisted police officers were required to obtain a search warrant before testing his rifle, which had been given to the officers by a private party. *Zagorski* rejected defendant's contention because "the subsequent testing of [defendant's] rifle did not compromise any further legitimate interest in privacy on the part of the defendant and the testing [consequently] was not a search under the Fourth Amendment." *Id.* at 813.

Likewise, in *State v. Owens*, 302 Or. 196, 729 P.2d 524 (1986), the court held that where there was probable cause to believe a lawfully seized substance was cocaine, a chemical test to determine identity of the substance was not a seizure, because it did not infringe on any privacy interests. *See United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (government's test of a substance revealing it was cocaine compromised no privacy interest).

Finally, we conclude that defendant's reliance on two airport cases (as examples of instances in which scientific tests were held to be searches) is misplaced. Those cases focused on the *method* used to acquire information, rather than on the quality and composition of the evidence sought. *United States v. Henry*, 615 F.2d 1223 (9th Cir.1980) (x-ray scanner), held that a traveler had a reasonable expectation of privacy in the items he had chosen to conceal in his suitcase. In *United States v. Epperson*, 454 F.2d 769 (4th Cir.), *cert. denied*, 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972), the court concluded that a magnetometer test for metal, although a search, was not unreasonable. In so ruling, *Epperson* balanced the minimal invasion of privacy caused by the test against the compelling necessity to protect passengers from air piracy.

We determine that defendant did not have a reasonable expectation of privacy in the individual manufacturing characteristics or defects of the handgun, which was lawfully in police custody. Consequently, the test firing did not abridge defendant's fourth amendment rights.

In summary, we uphold defendant's conviction on the five issues raised by defendant. The trial court's judgment and sentence are affirmed.

IT IS SO ORDERED.

DONNELLY and ALARID, JJ., concur.