920 P.2d 1038

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Alonzo FLORES, Defendant–Appellant.**

**No. 16371.**

Court of Appeals of New Mexico.

May 1, 1996.

Tom Udall, Attorney General, M. Anne Wood, Ass't Attorney General, Santa Fe, for Appellee.

Rita LaLumia, Santa Fe, Gary Hill, El Paso, TX, for Appellant.

## OPINION

BOSSON, Judge.

1. This case explores three issues of current interest in our search and seizure jurisprudence. The first concerns an anonymous tip and the degree of corroboration that is necessary to justify an investigatory stop based on reasonable suspicion. The second involves consent to a vehicle search and the limits imposed on expanding the search beyond reasonable boundaries of time, place, and duration. The third issue, and the most probative for this case, explores the evidentiary consequences when a valid investigatory detention continues unreasonably and becomes a de facto arrest without probable cause. Because we determine in this case that the continuing detention of Defendant was a de facto arrest without probable cause and without consent, we hold that the resulting evidence should have been suppressed. We reverse and remand.

## BACKGROUND

2. On May 16, 1994, at approximately 4:20 p.m., the sheriff's office in Van Horn, Texas, called Lieutenant Guy Chavarria of the Artesia Police Department about a tip that the Texas sheriff's deputy had received from a local confidential informant. According to the tip, within the past hour to an hour and a half, three vehicles had left Van Horn together on their way to Artesia carrying 200 to 250 pounds of marijuana, possibly in the tires of one of the vehicles. The informant described the vehicles as a white car with a blue vinyl top, a purple or blue pickup truck with a camper shell, and a brown or maroon pickup truck with chrome wheels.

3. Lt. Chavarria alerted his fellow officers. He and Detective Randy Pitts drove south in an unmarked police car on Route 285, the most direct route between Artesia and Van Horn. They spotted two vehicles fitting the description in the tip, a white car and a maroon pickup truck, heading north. After the vehicles turned into Artesia, the officers called for marked patrol cars to assist them. The vehicles were stopped at Seventh Street and J.J. Clarke Drive in Artesia. About ten minutes later, Defendant drove by in a blue pickup truck matching the

description of the third vehicle in the tip. When Defendant turned around to approach the scene, police stopped his truck with weapons drawn. Defendant got out of his truck and was handcuffed. He was told that the police suspected him of carrying marijuana, and he was asked to consent to a search of the truck. Defendant agreed and signed a consent form which described the search as a 1992 GMC pickup truck and indicated the location as the north alley of J.J. Clarke and Seventh Street. Defendant was asked if he had any weapons and he responded candidly that he had a 9mm pistol in the camper shell. Detective Pitts looked in the back window of the camper shell and saw the gun but left it there because he considered it secured. The police searched all three vehicles but found no marijuana. A narcotics dog failed to alert to the presence of any drugs.

4. After about an hour at the roadside search, the police then took the three vehicles and their drivers to a city warehouse where they undertook a more comprehensive search that even included removing the tires. A narcotics dog again sniffed the vehicles and tires with the same result. No drugs were found. At some point toward the end of the warehouse search, after Defendant had been in custody for several hours, Detective Pitts decided to check Defendant's gun through the National Crime Information Center (NCIC) database whereupon he learned that the gun had been reported stolen. The police then formally arrested Defendant and read him his *Miranda* rights. Defendant signed an "Advice of Rights" form at 7:47 p.m. and told police that he had purchased the gun for $150 from a man who had come by his place of work.

5. Defendant filed a motion to suppress the gun and the incriminating NCIC information. The trial court determined that the initial stop was lawful and that Defendant's consent to search at the roadside was voluntary and uncoerced. At trial, Defendant again moved to suppress, but the stolen gun was admitted into evidence. Defendant was convicted of one count of receiving stolen property.

## DISCUSSION

### Standard of Review

6. When an appellate court reviews factual determinations made by the trial court, it determines whether the findings are supported by substantial evidence in the record. *State v. Bidegain,* 88 N.M. 466, 470, 541 P.2d 971, 975 (1975). However, we afford a de novo review to the trial court's application of law to the facts, particularly when a mixed question of fact and law involves predominantly legal conclusions and constitutional rights. *State v. Attaway,* 117 N.M. 141, 145–46, 870 P.2d 103, 107–08 (1994). Search and seizure under the Fourth Amendment is just such a question. The preeminent inquiry is whether the search and seizure was reasonable. *State v. Martinez,* 94 N.M. 436, 440, 612 P.2d 228, 232, *cert. denied,* 449 U.S. 959, 101 S.Ct. 371, 66 L.Ed.2d 226 (1980). As our Supreme Court stated in *Attaway,* "[i]t is the duty of appellate courts to shape the parameters of police conduct by placing the constitutional requirement of reasonableness in factual context and we can discharge that duty only through meaningful review of lower court determinations." 117 N.M. at 145, 870 P.2d at 107; *see also State v. Vargas,* 120 N.M. 416, 418, 902 P.2d 571, 573 (Ct.App.) (whether facts comply with constitutional requirements is a legal question to be reviewed on de novo basis), *cert. denied,* 120 N.M. 213, 900 P.2d 962 (1995).

### Investigatory Stop

7. Defendant argues that the tip failed to provide enough reliable information to justify the stop. We disagree. The police may make an investigatory stop in circumstances that do not rise to probable cause for an arrest if they have a reasonable suspicion that the law has been or is being violated. *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–81, 20 L.Ed.2d 889 (1968); *State v. Galvan,* 90 N.M. 129, 131, 560 P.2d 550, 552 (Ct.App.1977). Reasonable suspicion must be based on specific articulable facts and the rational inferences that may be drawn from those facts. *State v. Lovato,* 112 N.M. 517, 519, 817 P.2d 251, 253 (Ct.App.),

cert. denied, 112 N.M. 388, 815 P.2d 1178 (1991).

8. An anonymous tip may justify an investigatory stop if the information is sufficiently corroborated by subsequent investigation to establish reliability. *Alabama v. White*, 496 U.S. 325, 332, 110 S.Ct. 2412, 2417, 110 L.Ed.2d 301 (1990). Although the United States Supreme Court described it as a close call in *White*, the Court was persuaded because certain behavior predicted in the tip actually occurred in several particulars even though not all the behavior was necessarily criminal in nature. *Id.* In *State v. Bedolla*, 111 N.M. 448, 451–52, 806 P.2d 588, 591–92 (Ct.App.), *cert. denied*, 111 N.M. 416, 806 P.2d 65 (1991), the lack of such corroboration of predictive detail invalidated a stop based on an anonymous tip.

9. In the case before us, the tip from the Van Horn sheriff's office gave the Artesia police information that three vehicles would be traveling together, as well as a description of the vehicles, the time of departure, the direction of travel, and the destination. By the time of the investigatory stop, the police had confirmed the description of the vehicles, the direction of travel, and the time of arrival at the described destination, all of which matched specific information relayed by the Van Horn sheriff's office. The trial court took judicial notice of the typical time for a trip between Van Horn and Artesia and noted that the time of Defendant's arrival was consistent.

10. Although this case presents another close call, we are persuaded that its facts have more in common with *White* than with *Bedolla*. Details in the tip were sufficiently self-corroborating to establish the overall reliability of the tip even though that information did not, taken alone, necessarily indicate criminal conduct. Although the informant in this case was unknown to the Artesia police, the information given by the Van Horn sheriff's office, once confirmed, provided reasonable suspicion for an investigatory stop to confirm or deny the basis of the suspicion. *See State v. De Jesus–Santibanez*, 119 N.M. 578, 581, 893 P.2d 474, 477 (Ct.App.) (police bulletin based on tip from confidential informant sufficient to justify investigatory stop),

cert. denied, 119 N.M. 464, 891 P.2d 1218 (1995); *Lovato*, 112 N.M. at 519, 817 P.2d at 253 (police had reasonable suspicion for stop when they saw car matching description given in police bulletin of car involved in drive-by shooting); *cf. Martinez*, 94 N.M. at 439, 612 P.2d at 231 (police radio bulletin based on probable cause provides officer with sufficient probable cause to arrest).

11. The roadside stop by the Artesia police appears to fall within the limitations of a *Terry* stop; the methods used by the officers at the roadside were designed to "verify or dispel" their suspicions. *See Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983) (plurality opinion). The United States Supreme Court has held that when police are conducting a *Terry* stop they may take steps to protect their own safety, including drawing weapons, when they have legitimate safety concerns. *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 683–84, 83 L.Ed.2d 604 (1985). The length of the stop and the scope of the search might well give a court reason for concern in a different factual context. But here, Defendant did consent to the search of his truck and there were three vehicles to be examined, under stressful circumstances, which would presumably take some time. Based on this record, we cannot say that the police acted unreasonably at the roadside.

### Continuing Detention at the Warehouse

12. After the investigatory search at the roadside proved unavailing, the Artesia police moved the vehicles and their drivers to a city warehouse for an exhaustive search lasting some two to three hours. Defendant argues that further detention and search at the warehouse exceeded the scope of what is permissible under reasonable suspicion and was a de facto arrest without probable cause. We agree. Although this issue was not argued with precision below, the issue was raised, and the State does not contend that a lack of preservation bars our consideration of it.

13. Once the officers failed to uncover any drugs at the roadside stop, the

very rationale for the stop, "to verify or quell ... suspicion," *State v. Werner*, 117 N.M. 315, 317, 871 P.2d 971, 973 (1994), was exhausted. At that point the police had no choice but to let Defendant go. "If the initial suspicion is dispelled, the *Terry* stop comes to an end and the suspect is free to leave. If, on the other hand, the initial suspicion is sufficiently verified, the stop ripens into an arrest." *Derricott v. State*, 84 Md.App. 192, 578 A.2d 791, 798 (1990), *rev'd on other grounds*, 327 Md. 582, 611 A.2d 592 (1992). Having failed to ripen into probable cause, unverified suspicion could not justify further detention. The reasonableness of the investigatory stop ended after the first search revealed nothing unusual. *See United States v. Recalde*, 761 F.2d 1448, 1456 (10th Cir. 1985) (the reasonableness of the detention and investigation ended after the first fruitless search); *State v. Estrada*, 111 N.M. 798, 802, 810 P.2d 817, 821 (Ct.App.1991) (although initial stop may be reasonable, officer's actions may make continued detention unreasonable and thus unlawful).

14. Understandably, this places police officers in a dilemma. They may well have a lingering suspicion, based on years of experience, that the suspect is a drug dealer. But the police are obliged to examine all the facts. Here, the investigatory stop was premised upon a tip which had been confirmed in neutral, non-incriminating details. This is a thin foundation, at best, which allowed the police to pursue their suspicions with an investigatory stop. But the police could not lose sight of the fact that the most significant aspect of the tip—200 pounds of marijuana—could not be confirmed. At that point, the earlier details became insignificant and the police reasonably had to adjust their actions based upon the total picture, including the complete absence of what should have been a highly visible amount of illegal narcotics.

15. When a detention exceeds the boundaries of a permissible investigatory stop, it becomes a de facto arrest requiring probable cause. *Dunaway v. New York*, 442 U.S. 200, 212, 99 S.Ct. 2248, 2256–57, 60 L.Ed.2d 824 (1979). In *Werner*, our Supreme Court noted, "[a] bright line test does not exist to evaluate whether an investigatory seizure is invasive enough to constitute an arrest requiring probable cause." 117 N.M. at 317, 871 P.2d at 973. The Court identified three factors in making such an evaluation: the length of the detention, the place of detention, and the restriction on the defendant's freedom of movement. *Id.* at 318, 871 P.2d at 974. Applying those factors to this case, we note that Defendant was removed from the site of the initial stop and taken in a police car to a city warehouse. He was detained there for two to three hours and was apparently handcuffed most of that time while the police looked in vain for marijuana. The police simply held Defendant "in case probable cause [was] later developed." *Id.* at 319, 871 P.2d at 975. If we were to tolerate continued detention on such speculation, the requirement of probable cause for arrest would be "turned upside down." *Id.* We have little trouble concluding under *Werner* that this detention was invasive enough to constitute an illegal, de facto arrest, and we hold that any evidence obtained from the warehouse search must be suppressed. *See State v. Gutierrez*, 116 N.M. 431, 446, 863 P.2d 1052, 1067 (1993) (purpose of exclusionary rule is to safeguard constitutional right to be free from unreasonable search and seizure); *State v. Vasquez*, 112 N.M. 363, 368, 815 P.2d 659, 664 (Ct.App.) (because police lacked probable cause, warrantless seizure was unlawful and evidence was tainted), *cert. denied*, 112 N.M. 388, 815 P.2d 1178 (1991); *see also Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963) (an important question in determining if evidence is tainted is whether police have exploited an illegal search or seizure to obtain the evidence).

16. Even conceding the warehouse search may have been a de facto arrest without probable cause, the State nonetheless contends that the evidence about the gun should not be suppressed because it was either a fruit of the initial investigatory stop before it became a de facto arrest, or was permitted by Defendant's roadside consent to the search. We do not agree with the State on either point.

*Seizure During Investigatory Stop*

17. At the hearing on the motion to suppress, Detective Pitts testified that his initial question to Defendant about guns was based on a concern for officer safety. Although the tip made no mention of weapons, Detective Pitts believed, based on his training and experience, that drug dealers frequently carry guns. During an investigatory stop, when an officer reasonably believes the individual may be armed and dangerous, he or she may check for weapons to ensure personal safety. *Terry,* 392 U.S. at 24, 88 S.Ct. at 1881–82. The nature of the crime being investigated may also justify a patdown search. *See generally* 4 Wayne R. LaFave, *Search and Seizure* § 9.5(a), at 255–56 (3d ed. 1996) (police have right to immediate frisk when the reason for the stop is for a type of crime for which the suspect would likely be armed, such as dealing in large quantities of narcotics); *United States v. Payne,* 805 F.2d 1062, 1065 (D.C.Cir.1986) (listing cases in which courts have taken notice that drug dealers are often armed); *cf. State v. Cobbs,* 103 N.M. 623, 630, 711 P.2d 900, 907 (Ct.App.1985) (because burglary is type of crime for which offender might be armed, officer had right to frisk suspect); *State v. Carter,* 707 P.2d 656, 660 (Utah 1985) (reasonable for officer to frisk burglary suspect who may be armed with weapons or tools such as knives and screwdrivers). However, the scope of a weapons search under *Terry* must be limited to its protective purpose. *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). A limited *Terry* search for weapons may not be expanded without probable cause into a search for evidence of a crime. *Id.*

18. In this case, legitimate security concerns gave police lawful possession of the gun, either actual or constructive, during the investigatory stop. In addition, Defendant consented to a search of his truck and voluntarily disclosed the gun. An NCIC search of the serial number engraved on the gun, if conducted during the investigatory stop, would likely have been permissible. *See State v. Reynolds,* 119 N.M. 383, 386, 890 P.2d 1315, 1318 (1995) (once car was lawfully stopped for safety reasons, an examination of license, registration, and insurance documents did not intrude on legitimate privacy interests and therefore was not a search within the meaning of the Fourth Amendment); *State v. Haar,* 110 N.M. 517, 524, 797 P.2d 306, 313 (Ct.App.) (permitting a gun lawfully seized for other reasons to be test fired while police were looking for evidence of crime; no violation of legitimate privacy interests and not a search), *cert. denied,* 110 N.M. 330, 795 P.2d 1022 (1990).

19. However, the police did not seize the gun or investigate it for evidence during the roadside stop. In this case, the gun was left in the camper shell of Defendant's pickup truck until the warehouse detention, which we have already determined was a de facto arrest without probable cause. At no time before the NCIC gun report did the police have probable cause to justify holding Defendant and the other drivers. Without the continuing illegal seizure of Defendant and his truck at the warehouse, the police could not have developed evidence about the gun several hours later. Therefore, despite what the State might have been able to do, had the police lawfully obtained evidence at the roadside stop, the evidence in this case was the fruit of an unlawful de facto arrest. *See State v. Gorsuch,* 87 N.M. 135, 138, 529 P.2d 1256, 1259 (Ct.App.1974) (the fact that incriminating evidence is obtained from an improper search and seizure does not validate an otherwise unlawful search); *see also United States v. Di Re,* 332 U.S. 581, 595, 68 S.Ct. 222, 228–29, 92 L.Ed. 210 (1948) (a search is not to be made legal by what it turns up); *cf. State v. Luna,* 93 N.M. 773, 778, 606 P.2d 183, 188 (1980) (evidence obtained during illegal search cannot be justified by the fact that the same evidence might have been obtained during an earlier search conducted for a different purpose), *overruling State v. Luna,* 91 N.M. 560, 564–65, 577 P.2d 458, 462–63 (Ct.App.), *cert. denied,* 91 N.M. 610, 577 P.2d 1256 (1978).

*Consent to Search*

20. The validity of a consensual search depends on the voluntary nature of the consent and whether the resulting search exceeds the reasonable scope of that consent.

The voluntariness of a consent to search is initially a question of fact for the trial court. *State v. Mann*, 103 N.M. 660, 665, 712 P.2d 6, 11 (Ct.App.1985), *cert. denied*, 103 N.M. 740, 713 P.2d 556 (1986). In *State v. Cohen*, 103 N.M. 558, 563, 711 P.2d 3, 8 (1985), *cert. denied*, 476 U.S. 1158, 106 S.Ct. 2276, 90 L.Ed.2d 719 (1986), the court identified the following three factors to be considered when an appeals court is assessing the voluntariness of a consent to search: (1) the consent must be unequivocal and specific, (2) the consent must be given without duress or coercion, and (3) the first two factors must be assessed with a presumption against the waiver of constitutional rights. *See also State v. Anderson*, 107 N.M. 165, 167, 754 P.2d 542, 544 (Ct.App.1988) (same).

21. The trial court found that Defendant's consent at the initial stop was voluntary, and we do not disturb that finding. The State did not ask the trial court to find that Defendant's consent had been expanded to include the warehouse search as well, something the State only now suggests.

22. When consent is voluntarily given, the scope of the search must not exceed the consent. The scope of the search is defined by and limited to the actual consent given. *State v. Alderete*, 88 N.M. 619, 621, 544 P.2d 1184, 1186 (Ct.App.1976). A defendant's consent must be sufficient to encompass the search that follows. *State v. Valencia Olaya*, 105 N.M. 690, 694, 736 P.2d 495, 499 (Ct.App.), *cert. denied*, 105 N.M. 689, 736 P.2d 494 (1987). If a search goes beyond the scope of the consent given, there is no unequivocal and specific consent to the particular search, and the first of the *Cohen* factors is lacking. *Id.* at 694–95, 736 P.2d at 499–500.

23. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991). "The scope of a search is generally defined by its expressed object." *Id.* Discussing common limitations on the scope of consensu-al searches, LaFave notes, "As a general rule, it would seem that a consent to search may be said to have been given on the understanding that the search will be conducted forthwith and that only a single search will be made." 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 3.10(f), at 358 (1984). The most frequent limitation associated with consensual searches is that the intensity of the police search may not exceed the scope of consent. *Id.* When the police have stated that a search is for a particular purpose, they may not expand that search to "'a general exploratory search.'" *Id.* (quoting *United States v. Dichiarinte*, 445 F.2d 126, 129 (7th Cir.1971)). A consensual search becomes unreasonable when it goes beyond the scope of a suspect's consent. *Dichiarinte*, 445 F.2d at 129. In *Dichiarinte*, the police obtained consent to search for narcotics, but while conducting that search also read and seized personal papers of the suspect which were later used to convict him of tax evasion. *Id.* at 131. In suppressing the evidence, the court stated that "the mere suspicion or expectation that an item may prove incriminating to a defendant in some unknown way—even if subsequent examination discloses that the item is evidence of previously unsuspected criminal activity—is not sufficient justification for the item's seizure." *Id.* at 129 n. 2.

24. In this case, Defendant consented to a roadside search of his truck for narcotics. Nothing in the consent form suggests that Defendant consented to a search anywhere else or that the police had an interest in anything other than narcotics. There is nothing in the record indicating that Defendant subsequently agreed to be transported in handcuffs to a city warehouse for a search lasting two to three hours during which his truck would be partially disassembled. The prolonged and extensive search of the vehicles at the warehouse exceeded the scope of the search for which consent had been given. "A search beyond the scope of consent is, therefore, not pursuant to a voluntary consent." *Valencia Olaya*, 105 N.M. at 695, 736 P.2d at 500. The State had the burden of showing that the continuing detention was consistent with the express, limited

terms of the initial consent. *See Vasquez*, 112 N.M. at 366, 815 P.2d at 662.

25. It may be true, as the State now suggests, that Defendant did not object to the warehouse search. In some circumstances, failure to object to a search has been interpreted as acquiescence. *Valencia Olaya*, 105 N.M. at 695, 736 P.2d at 500. However, those factual circumstances differ significantly from this case. Generally, a determination of acquiescence by silence has been made in situations involving a single police officer conducting a search in a neutral public location with the suspect free of handcuffs. *See, e.g., United States v. Wacker*, 72 F.3d 1453, 1470 (10th Cir.1995); *United States v. Dewitt*, 946 F.2d 1497, 1501 (10th Cir.1991), *cert. denied*, 502 U.S. 1118, 112 S.Ct. 1233, 117 L.Ed.2d 467 (1992); *United States v. Espinosa*, 782 F.2d 888, 892 (10th Cir.1986); *United States v. Sanchez*, 866 F.Supp. 1542, 1555 (D.Kan.1994) (memorandum and order); *People v. Olivas*, 859 P.2d 211, 215 (Colo.1993) (en banc).

26. Under the circumstances of this case, mere silence is not enough to establish consent to the second search. Defendant was kept in custody for several hours, handcuffed and faced with heavy weaponry in a hostile environment, while subjected to a second search that differed significantly in scope and location from the first. In this case, we decline to place the burden upon an accused to run the risk of protest. The "heavy burden" of establishing consent remains with the State. *See Valencia Olaya*, 105 N.M. at 694, 736 P.2d at 499. Indeed, given the illegal nature of the continued detention, it is unlikely, even if the police had secured a second express consent, that the State could persuade a court that the consent was freely and voluntarily given and untainted by the unlawful detention. *See Bedolla*, 111 N.M. at 453–56, 806 P.2d at 593–96 (state must prove consent to search was voluntary and free from taint of illegal state action).

*CONCLUSION*

27. Accordingly, we reverse Defendant's judgment and sentence and remand to the district court with instructions to suppress all evidence obtained as a result of the improper seizure and for further proceedings consistent with this opinion.

28. IT IS SO ORDERED.

PICKARD and BUSTAMANTE, JJ., concur.