**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2011-NMCA-055**

**Filing Date: April 8, 2011**

**Docket No. 29,214**

**STATE OF NEW MEXICO,**

  **Plaintiff-Appellant,**

**v.**

**GISELA ALDERETE,**

  **Defendant-Appellee.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Carl J. Butkus, District Judge**

Gary K. King, Attorney General
Santa Fe, NM

James W. Grayson, Assistant Attorney General
Albuquerque, NM

for Appellant

Gorence & Oliveros, P.C.
Robert J. Gorence
Albuquerque, NM

for Appellee

**OPINION**

**FRY, Judge.**

**{1}** Defendant Gisela Alderete was charged with possession of over one hundred pounds of marijuana with intent to distribute, along with other related charges, after detectives discovered a large amount of marijuana in her vehicle following a traffic stop. In a motion to suppress the evidence seized during the search of her vehicle, Defendant argued that the traffic stop was pretextual and that the actual motivation for the stop was that she had just

1

left a house that was under surveillance for drug trafficking. The district court agreed, concluding that but for the drug investigation, Defendant would not have been pulled over for her traffic offense, and it suppressed all of the evidence obtained during the search of Defendant's vehicle. On appeal from the district court's ruling, the State argues that the subjective motivations of officers other than the stopping officer cannot be imputed to the stopping officer and that if the motivations of the other officers are considered, the detective who requested the stop had a constitutionally valid basis for doing so. For the following reasons, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

**BACKGROUND**

{2}     In March 2007, detectives with the Albuquerque Police Department received a tip from a confidential informant that a house in Albuquerque was being used as a stash house for large amounts of marijuana and that a large quantity of the drug would be delivered to the house sometime during the week of March 12. The detectives had previously received reliable information from the informant. Throughout the week of March 12, the detectives conducted surveillance of the house and, at 7:10 a.m. on March 16, a black pickup truck arrived at the house and a man got out and approached the front door. A second man came out of the house, and the two men returned to the truck, where they began to have a conversation while looking at three large moving boxes in the back of the truck. According to the affidavit for a search warrant, the two men were "looking around in all directions and appeared to be conducting counter surveillance . . . in [an] attempt to locate police." The two men removed the boxes from the truck and carried them into the house. At some point after the detectives observed this activity, the confidential informant contacted the detectives and informed them that he or she knew "first hand, through conversations with the residents [of the home], that a large quantity of marijuana is currently being stored at the residence." Based on their observations and the information provided by the informant, one of the detectives obtained a warrant for a search of the house.

{3}     At 10:20 a.m., approximately three hours after the boxes were taken into the house, and while the signed search warrant was en route, the detectives observed a Hispanic male, later identified as Defendant's husband, Mario Alderete, load a box resembling the three boxes that had been delivered in the morning into a truck and leave the premises. Mr. Alderete's vehicle was stopped for a traffic violation and, at the time of the stop, Mr. Alderete was on his cell phone. He was given a warning for talking on the phone while driving. When the stopping officer approached the vehicle, he could see that the box was opened and that it contained several packages wrapped in brown packing tape, which was consistent with the packaging of large quantities of drugs. Mr. Alderete subsequently consented to a search of his vehicle, and approximately forty-nine bundles of marijuana were discovered in the box.

{4}     Approximately ten minutes after Mr. Alderete left the house and was stopped, the detectives surveilling the house observed a white Ford Expedition leave the residence's

2

garage. Sergeant Christman radioed for someone to pull the vehicle over, and Officer Jason Westbrook, who was waiting in a nearby staging area in preparation for the execution of the search warrant, responded. Officer Westbrook testified that he heard on the radio that a white Ford Expedition had just come out of the garage at the subject house, and he heard someone say that "they would like the vehicle . . . that was leaving the residence to be stopped." Officer Westbrook testified that this was not an order or a directive but "more of a request." After hearing the request to stop the vehicle, Officer Westbrook immediately left the staging area and observed the vehicle make a left turn onto Juan Tabo and begin traveling northbound. Officer Westbrook caught up to the vehicle and observed it make two sudden lane changes without signaling. Officer Westbrook testified that he believed that the driver might have been trying to get out of the lane he was in "to avoid being stopped or just to not be ahead of" him.

{5}    When he stopped the vehicle, Officer Westbrook asked the driver (later identified as Defendant) for the bill of sale for the vehicle and her insurance information. Defendant provided him with paperwork for a completely different vehicle and advised him that she did not have insurance. Officer Westbrook advised Defendant that he was going to have to tow her vehicle pursuant to the police department's standard operating procedure requiring the towing of uninsured vehicles.

{6}    Prior to beginning an inventory search of the vehicle, Officer Westbrook advised Defendant that he had seen two large cardboard boxes in the back of the vehicle and asked her if she had anything valuable in the boxes. According to Officer Westbrook, Defendant "became extremely nervous at that point[,] stated that she did not have any idea what was in those boxes," and told Officer Westbrook that she would need to call her husband. During a subsequent inventory search of the vehicle, Officer Westbrook opened the boxes and observed "small brick-like shaped items" in the boxes. Another detective later obtained a search warrant for Defendant's vehicle and its contents and discovered fifty-eight bundles of marijuana in one box and fifty-six bundles in the other.

{7}    Defendant was arrested and charged with possession of marijuana (over one hundred pounds) with intent to distribute, conspiracy to possess, and child abuse based on the fact that her two-year-old daughter was in the car at the time of the stop. Prior to trial, Defendant moved to suppress the evidence obtained during the inventory search of her vehicle, arguing that Officer Westbrook's traffic stop was pretextual, that the real reason she was stopped was to investigate her involvement in drug activity, and that Officer Westbrook did not have reasonable suspicion to justify stopping Defendant to investigate her involvement in drug activity. Relying on our recent decision in *State v. Ochoa*, 2009-NMCA-002, 146 N.M. 32, 206 P.3d 143 (filed 2008), *cert. quashed*, 2009-NMCERT-011, 147 N.M. 464, 225 P.3d 794, the district court concluded that while Officer Westbrook had reasonable suspicion to stop Defendant for the traffic offense she committed, the underlying reason for the stop was the ongoing drug investigation at the residence and the stop was therefore pretextual. The court noted that "but for the request of the drug investigation officer . . . that [Defendant] be stopped, there[ is] no indication that there otherwise would have been a stop." The court

also concluded that there was no individualized reasonable suspicion directed at Defendant herself that would otherwise make the stop lawful. The court explained that Defendant was not a prime suspect and that there was not "enough of a factual predicate for there to be a reasonable suspicion directed specifically to her." Based on its conclusion that the stop was pretextual, the district court suppressed all of the evidence found in Defendant's vehicle. The State appeals.

{8}    On appeal, the State argues that the evidence should not have been suppressed because: (1) the subjective motivations of officers other than the stopping officer cannot be imputed to the stopping officer; (2) if the motivations of the other officers are considered, the detective who requested the stop had a constitutionally valid basis for doing so; and (3) we should reconsider our decision in *Ochoa*. Because we agree with the State's assertion that the detectives had a constitutionally valid basis for stopping Defendant's vehicle, we do not address the State's remaining arguments.

## DISCUSSION

### Standard of Review

{9}    Because suppression of evidence is a mixed question of law and fact, we apply a two-part review to a district court's decision regarding a motion to suppress. We review any factual questions under a deferential substantial evidence standard, and we review the application of the law to the facts de novo. *State v. Neal*, 2007-NMSC-043, ¶ 15, 142 N.M. 176, 164 P.3d 57. In doing so, we "review the facts in the light most favorable to the . . . district court's factual findings so long as substantial evidence exists to support those findings." *Id.*

### Pretext

{10}    The district court determined that Officer Westbrook's stated reason for stopping Defendant, an unsafe lane change, was pretextual and that the actual motive for the stop was to investigate whether she was involved in drug activity. The court based this determination on the test we delineated in *Ochoa*, 2009-NMCA-002, ¶ 40, for determining whether a stop is pretextual. In *Ochoa*, we explained that the district court should first determine whether there was reasonable suspicion or probable cause for the stop and then decide if the officer's actual motive for the stop was unrelated to the justification for the stop. *Id.* "[T]he defendant has the burden of proof to show pretext based on the totality of the circumstances" and, "[i]f the defendant has not placed substantial facts in dispute indicating pretext, then the seizure is not pretextual." *Id.* However, "[i]f the defendant shows sufficient facts indicating the officer had an unrelated motive that was not supported by reasonable suspicion or probable cause, then there is a rebuttable presumption that the stop was pretextual," at which point the burden shifts to the state to establish, based on the totality of the circumstances, that the officer would have stopped the defendant even without the unrelated motive. *Id.* Determining whether a stop is pretextual requires courts to "consider the totality of the

4

circumstances, judge the credibility of witnesses, weigh the evidence, make a decision, and exclude the evidence if the stop was unreasonable at its inception." *Id.* ¶ 39. We explained that "[t]he totality of the circumstances includes considerations of the objective reasonableness of an officer's action and the subjective intent of the officer—the real reason for the stop." *Id.*

**{11}** In holding that pretextual stops are unconstitutional, we noted that "[t]he purpose of our objective reasonable suspicion/probable cause exception to the warrant requirement is to prevent officers from arbitrarily acting on whims or unsupported hunches" and that "[t]he purpose of the exception is undermined where the reason for the stop is an unsupported hunch or is otherwise legally insufficient." *Id.* ¶ 37. Thus, while evidence obtained from a search incident to a pretextual stop will be suppressed, suppression is only required if the "unrelated motive . . . *was not supported by reasonable suspicion or probable cause.*" *Id.* ¶ 40 (emphasis added). *See State v. Gonzales*, 2011-NMSC-012, ¶ 14, __ N.M. __, __ P.3d __ (No. 31,891, Mar. 9, 2011) (explaining that a pretextual stop is unconstitutional only if law enforcement lacks reasonable suspicion to stop the defendant for the unrelated motive).

**{12}** Because an otherwise pretextual stop will only be invalidated if the underlying motive is not supported by reasonable suspicion or probable cause, we address first whether the unrelated motive the district court identified—stopping Defendant's vehicle to investigate drug activity—was supported by reasonable suspicion or probable cause. Because we conclude that this unrelated motive for the stop was supported by reasonable suspicion, we do not address whether the court properly determined that the officer's stated reasons were not the actual reasons for the stop, nor do we accept the State's invitation to reconsider *Ochoa*.

### Reasonable Suspicion Justified an Investigatory Stop of Defendant's Vehicle

**{13}** The district court concluded that the unrelated motive for stopping Defendant's vehicle was not supported by reasonable suspicion because there was no "individualized reasonable suspicion directed at [Defendant] herself." On appeal, the State argues that there was reasonable suspicion that the driver of the vehicle that left the garage of the residence under surveillance, whoever that may have been, was involved in criminal activity and that the stop of the vehicle was therefore permissible. We agree.

**{14}** "With respect to determinations of reasonable suspicion, we engage in a de novo review, as the decision of whether police conduct was objectively reasonable extends beyond fact-finding." *Neal*, 2007-NMSC-043, ¶ 19 (internal quotation marks and citation omitted). Whether an officer has reasonable suspicion is "measured by an objective standard, in which the court examines the totality of the surrounding circumstances, to determine whether the officer acted reasonably in expanding the scope of [the] inquiry." *Id.* ¶ 21 (internal quotation marks and citation omitted). Reasonable suspicion is defined as "a particularized suspicion, based on all the circumstances that a particular individual, the one detained, is breaking, or has broken, the law." *Id.* (emphasis omitted) (internal quotation marks and citation omitted).

5

**{15}** "Police may make an investigatory stop in circumstances that do not rise to the level of probable cause for an arrest if the officers have a reasonable suspicion that the law has been or is being violated." *State v. Sanchez*, 2005-NMCA-081, ¶ 11, 137 N.M. 759, 114 P.3d 1075. In order to justify a stop based on reasonable suspicion, the State "must provide specific and articulable facts that, together with the rational inferences from those facts, reasonably warrant the intrusion." *Id.* Officers are entitled to draw upon their experience and training and make inferences and deductions about the information available to them, but reasonable suspicion cannot be based on unsupported intuition or inarticulate hunches. *See State v. Flores*, 1996-NMCA-059, ¶ 8, 122 N.M. 84, 920 P.2d 1038. Specific information from an informant or reasonable inferences drawn from that information may provide reasonable suspicion to justify an investigative stop. *State v. De Jesus-Santibanez*, 119 N.M. 578, 581, 893 P.2d 474, 477 (Ct. App. 1995). In determining whether reasonable suspicion exists, our concern is whether the facts and inferences known to the officer "warrant a person of reasonable caution in believing that criminal activity was possibly afoot." *State v. Prince*, 2004-NMCA-127, ¶ 10, 136 N.M. 521, 101 P.3d 332 (internal quotation marks omitted).

**{16}** The district court relied on *Ochoa* in granting the motion to suppress. *Ochoa* relied on *Neal,* in which our Supreme Court held that an officer lacked reasonable suspicion to detain an individual in order to search for drugs where the officer had observed the defendant briefly stopping in front of a house that was under investigation for drug trafficking and speaking to a known convicted felon who resided at the house but where the officer did not have any specific information that criminal activity had occurred. *Neal*, 2007-NMSC-043, ¶ 28. The Court explained that "[the d]efendant's mere association with a convicted felon . . . who was under surveillance in an ongoing drug investigation, was insufficient to create reasonable suspicion of [the d]efendant." *Id.* ¶ 30. The Court noted that "it was not reasonable for [the officer] to infer from the circumstances and his observations that [the d]efendant had been involved in a drug transaction" and that "[the d]efendant's innocent conduct and the surrounding circumstances, viewed together and indulging the factual inferences drawn by [the officer], do not constitute the type of individualized, specific, articulable circumstances necessary to create reasonable suspicion that [the d]efendant himself was involved in criminal activity." *Id.* ¶ 31. The Court characterized the circumstances instead as "the type of conjecture and hunch we have rejected in the past as insufficient to constitute reasonable suspicion." *Id.* Notably, the officer in *Neal* did not observe an exchange of drugs or any other suspicious activity. *Id.* ¶¶ 4-5. Rather, he merely saw the defendant talk to a man who was a known felon outside of a house that was under investigation for drug activity. *Id.*

**{17}** In *Ochoa*, we relied on *Neal* to conclude that the stop was unconstitutionally pretextual because the underlying basis for the stop, investigation of drug activity, lacked reasonable suspicion. The officers were surveilling a house for drug trafficking when they observed a vehicle they had never seen before arrive at the house. *Ochoa*, 2009-NMCA-002, ¶ 2. When the vehicle later drove away, the officers stopped the vehicle because they wanted to identify and question the driver. *Id.* We concluded that these facts were

6

insufficient to create reasonable suspicion that the defendant was involved in criminal activity. *Id.* ¶ 45.

**{18}**    Unlike the officers in *Neal* and *Ochoa*, the detectives in the present case who were observing the subject house had specific factual information regarding the residents' possible involvement in drug trafficking and therefore had reasonable suspicion to conduct an investigatory stop of Defendant's vehicle to confirm or dispel their suspicions.    The detectives had a tip from a reliable, confidential informant, which included specific, predictive information that a large amount of marijuana was going to be delivered to the house under surveillance.  This information was corroborated by the delivery of three large boxes and the subsequent call from the informant indicating that marijuana was currently being stored in the house. *See Flores*, 1996-NMCA-059, ¶ 9 (explaining that informant's tip, which included specific predictive information, was confirmed by police observation and provided reasonable suspicion for an investigative stop).  The detectives understood from the informant that the residence was a possible "stash house" used for the temporary storage and redistribution of large amounts of drugs.  On the basis of this information, Detective Porter obtained a search warrant for the house and "any structures or objects found within the curtilage" of the residence.  Thus, a district court judge concluded that this information constituted probable cause for such a search, although apparently neither Officer Westbrook nor the detectives observing the house knew that the judge had signed the warrant at the time Defendant's vehicle was observed leaving the garage.

**{19}**    It appears that shortly after Detective Porter left the scene to obtain the search warrant, detectives saw the man later identified as Defendant's husband leaving the house at 10:10 a.m. with one of the three boxes.  The officers stopped Defendant's husband and discovered forty-nine packages of marijuana in that box.  At 10:20 a.m., detectives saw the vehicle Defendant was driving leave the garage and drive away.  Given the closeness in time of the two departures from the house, the detectives could reasonably infer that Defendant was taking one or more of the remaining two boxes to a secondary location when her vehicle left the house shortly after her husband's vehicle left.  Unlike the circumstances in *Ochoa*, where the sole basis for the officer's suspicion was that a vehicle briefly stopped at a known drug house, the detectives in this case could reasonably suspect that a large amount of drugs had been in the house that Defendant had just left and that Defendant could be transporting those drugs to an alternate location.  Indeed, the informant had indicated that the house was to be used for temporary storage and redistribution of the drugs.

**{20}**    Thus, specific and articulable facts supported the detectives' suspicion that Defendant was engaged in illegal activity, and that suspicion was not an unsupported intuition or a baseless hunch.  Rather, the suspicion directed at Defendant's vehicle was based on the detectives' surveillance of the house from which the vehicle exited, a reliable tip that marijuana was going to be delivered to and redistributed from the house, corroboration of the tip, and the reasonable inferences that could be drawn from the fact that Defendant's husband left the house with only one of the three previously observed boxes in close proximity to Defendant's leaving the garage.  While the detectives did not have any

information regarding Defendant herself, they had reasonable suspicion that the driver of the vehicle that left the garage, whoever that may have been, was involved in the drug activity they had observed throughout the course of their investigation, and they were permitted to make an investigatory stop to confirm or dispel their suspicions. We therefore conclude that the unrelated motive for stopping Defendant's vehicle—the investigation of drug activity—was supported by reasonable suspicion. Consequently, the district court order suppressing the evidence obtained during the inventory search of Defendant's vehicle was erroneous.

**{21}** The dissent contends that we have "abandon[ed] the standard of review" and "assert[ed] a view and interpretation of the facts in the light most favorable for reversal." Dissent, ¶ 36. The dissent bases this contention on its view that we have failed to give appropriate deference to the district court's findings. We believe we have applied the proper standard of review. We have deferred to the district court's findings, which included findings as to the circumstances leading up to and surrounding the encounter with Defendant and a finding that Officer Westbrook was credible. *See Neal*, 2007-NMSC-043, ¶ 15 (explaining that appellate courts "defer[] to the district court's factual findings so long as substantial evidence exists to support those findings"). However, the question of whether reasonable suspicion supported the stop of Defendant to investigate her involvement in suspected drug trafficking is subject to de novo review. *Id.* ¶ 19 ("With respect to determinations of reasonable suspicion, we engage in a de novo review, as the decision of whether police conduct was objectively reasonable extends beyond fact-finding." (internal quotation marks and citation omitted)). While our de novo assessment of the issue of reasonable suspicion differs from that of the district court, nonetheless it is "the duty of appellate courts to shape the parameters of police conduct by placing the constitutional requirement of reasonableness in factual context." *Id.* (internal quotation marks and citation omitted).

**CONCLUSION**

**{22}** For the foregoing reasons, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

**{23}    IT IS SO ORDERED.**

 

_____
**CYNTHIA A. FRY, Judge**

**I CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

**TIMOTHY L. GARCIA, Judge (dissenting).**

8

**GARCIA, Judge (dissenting)**

**{24}**    I respectfully dissent in this case.  Under the proper standard of review, reasonable particularized suspicion did not exist to stop Defendant's vehicle based upon the information available from the surveillance of the Grand Avenue house.  Without a valid independent particularized basis to stop Defendant's vehicle, the legitimacy of the traffic stop must be scrutinized to determine whether the stop was pretextual.  Under our deferential standard of review, I agree with the district court that the stop was pretextual and the evidence should be suppressed.

**{25}**    One preliminary matter shall be addressed briefly.  The information known or attributable to Officer Westbrook in order to establish reasonable suspicion to stop Defendant's vehicle can be based upon the knowledge and information shared among his fellow officers prior to the stop of Defendant's vehicle.  This ability to attribute information to the actual officer initiating a stop or seizure is commonly referred to as the "fellow officer rule" or "collective knowledge doctrine" by our case law.  *See State v. Vandenberg*, 2003-NMSC-030, ¶¶ 38-39, 134 N.M. 566, 81 P.3d 19 (applying the fellow officer rule to conclude that an officer may reasonably rely on the information in a BOLO to establish reasonable suspicion for an investigatory stop); *see also United States v. Chavez*, 534 F.3d 1338, 1345-48 (10th Cir. 2008) (developing the framework for applying the collective knowledge doctrine in significantly more detail).  It is undisputed that Officer Westbrook had very limited personal knowledge of the specific facts arising from the confidential informant or the surveillance of the Grand Avenue house.  Additional information is being attributed to him pursuant to the fellow officer rule.  Without addressing the nuances of attribution under the fellow officer rule, I shall simply agree with the majority that the information known by the other members of the Valley Narcotics Unit and APD Gang Unit (collectively referred to as the Narcotics Unit) may be attributed to Officer Westbrook for purposes of this dissent.

**Re-Characterization of the Factual Background**

**{26}**    Although many of the facts have been presented by the majority, I must take this opportunity to restate and occasionally repeat some of the important facts in order to present the factual circumstances in the light most favorable to the district court's decision in this case.  *See Neal*, 2007-NMSC-043, ¶ 15 ("[W]e do not sit as trier of fact, recognizing that the district court has the best vantage from which to resolve questions of fact and to evaluate witness credibility.  Therefore, we review the facts in the light most favorable to the prevailing party, deferring to the district court's factual findings so long as substantial evidence exists to support those findings." (citations omitted)).  The Narcotics Unit, with the assistance of a confidential informant, identified the Grand Avenue house as a suspected stash house for the storage of large amounts of marijuana. Narcotics Unit members involved in this operation included at least two sergeants, five detectives,  and several patrol level officers.  As the majority noted, a large shipment was anticipated to arrive during the week

9

of March 12, 2007. Surveillance revealed that three large shipping boxes were delivered on March 16, and two Hispanic males were involved in the delivery. The confidential informant confirmed first-hand that a large quantity of marijuana was in fact being stored at the Grand Avenue house location on March 16. Based upon this information, a search warrant was sought and obtained by Detective Porter at around 10:02 a.m. to conduct a search of the Grand Avenue house. No individual arrest warrants were sought or obtained.

{27}    Before the search warrant was available for delivery or service at the Grand Avenue house, two vehicles departed, one at 10:10 a.m. and a second at 10:20 a.m. The first departure involved a Hispanic male loading a pick-up truck with one shipping box that resembled the three boxes delivered earlier in the day. A traffic stop was initiated against this pick-up truck shortly after its departure. During the time that the stop was being conducted of the pick-up truck, the second vehicle left the Grand Avenue house location from the previously unopened garage. This second vehicle was a white Ford Expedition being driven by Defendant. No one in the entire Narcotics Unit had any prior information from the confidential informant or from its surveillance operation regarding this particular vehicle or the woman driving the vehicle. The Narcotics Unit surveillance team simply observed this vehicle leaving the Grand Avenue house location prior to the arrival of the search warrant. The stop of this second vehicle is the issue in this case.

{28}    What is important to recognize regarding the stop of this second vehicle is the lack of any particularized information that was previously known or attributable to this vehicle or its female driver. For strategic reasons, the State intentionally decided not to provide particularized information and evidence at the suppression hearing due to circumstances involving the confidential informant. Without faulting the State for its decision, we cannot change the State's burden of proof to establish objective and particularized reasonable suspicion based upon the evidence presented.

{29}    First, there was no information available that Defendant was either a resident or occupant of the Grand Avenue house. The Narcotics Unit previously identified only one individual as a possible owner of the Grand Avenue house. That individual, with initials E.D., was never connected by the Narcotics Unit to anyone involved in the incident. In addition, the Narcotics Unit had no prior knowledge or information regarding Defendant. The confidential informant failed to specifically identify or describe any particular individual present at the Grand Avenue house on March 16 or prior to that date. The confidential informant also failed to identify to the Narcotics Unit any female suspect, much less any particular information regarding Defendant, or the white Ford Expedition. The confidential informant did not identify the contents of the three moving boxes. Finally, the confidential informant did not provide any information that the marijuana located at the residence was about to be moved or was being moved by the residents.

**Reasonable Particularized Suspicion of Defendant**

**{30}** Objective and particularized suspicion of the Defendant was never established in this case. The majority erroneously stated that "the detectives in the present case who were observing the subject house had *specific factual information* regarding the residents' possible involvement in drug trafficking *and therefore had reasonable suspicion to conduct an investigatory stop of Defendant's vehicle*." Majority Opinion, ¶ 18 (emphasis added). The suppression hearing revealed that neither the Narcotics Unit nor the confidential informant possessed particularized information regarding the contents of the moving boxes, the Defendant, the white Ford Expedition, or any plans regarding the movement of the narcotics.

**{31}** Viewing the facts under the proper deferential standard of review favoring the district court's ruling, no particularized facts or suspicion existed when the white Ford Expedition left the garage and drove away. *State v. Jason L.*, 2000-NMSC-018, ¶ 10, 129 N.M. 119, 2 P.3d 856 (stating that we must defer to the district court's findings of fact to the extent they are supported by substantial evidence). Particularized facts were known about certain Hispanic males and other specific vehicles, including the pick-up truck, through the Narcotics Unit surveillance. In addition, particularized facts were known about the actual presence of marijuana in the Grand Avenue house from the confidential informant. The district court did not attribute any of these particularized facts to Defendant or to the white Ford Expedition. As a result, unless the law is interpreted to allow law enforcement officers to stop and search any unknown vehicle and driver that leaves from the garage of a location where probable cause has been established to believe a large amount of marijuana is being stored, then reasonable suspicion does not exist under Article II, Section 10 of the New Mexico Constitution to stop and search the departing vehicle. Stated another way, if law enforcement has probable cause to believe that marijuana is located inside a specific house, does reasonable suspicion exist to stop and investigate unknown vehicles and drivers that leave the garage of the house and drive away? I agree with the district court that the facts in this case support a determination that reasonable particularized suspicion was not established under Article II, Section 10 of the New Mexico Constitution.

**Inferences to Establish Reasonable Suspicion**

**{32}** The majority accurately recognized that the facts presented by the State must establish "particularized suspicion" based upon "specific and articulable facts" that Defendant is "breaking, or has broken, the law." Majority Opinion, ¶¶ 13-15. Justice Bosson best described this analysis in *Funderburg*:

> The term reasonable suspicion does not lend itself to a neat set of legal rules. The United States Supreme Court has described reasonable suspicion simply as a particularized and objective basis for suspecting the person stopped of criminal activity. We agree that reasonable suspicion is a commonsense, nontechnical conception[], which requires that officers articulate a reason, beyond a mere hunch, for their belief that an individual has committed a criminal act.

11

2008-NMSC-026, ¶ 15, 144 N.M. 37, 183 P.3d 922 (internal quotation marks and citations omitted). Again, for tactical reasons, the State decided to limit the evidence presented by Officer Westbrook and Detective Porter at the suppression hearing. Particularized and objective evidence about Defendant was not presented in order to protect the confidential informant.

{33}    Despite the State's decision to only submit vague and generalized evidence about the facts in this case, the majority has made various inferences from the facts in order to support a position that reasonable particularized suspicion can be established in this case. Majority Opinion, ¶ 19. The majority asserts that "[g]iven the closeness in time of the two departures from the house, the detectives *could reasonably infer* that Defendant was taking one or more of the remaining two boxes to a secondary location when her vehicle left the house shortly after *her husband's* vehicle left." *Id.* (emphasis added). At the time the first vehicle left the house, there was no evidence available regarding the identity of the first driver or that he was related in any manner to Defendant. The detectives did not even know Defendant existed until they first saw her leave the garage at 10:20 a.m. Nobody knew what was in the moving boxes until after the first vehicle was stopped and later searched. Nobody knew if anything was in the Ford Expedition when it left the residence ten minutes later. All inferences, therefore, should be in favor of sustaining the district court's ruling. If any inferences were made, the district court would have reasonably inferred that the Narcotics Unit did not have any particularized information about the contents of what was in either vehicle when the Defendant's vehicle left the house at 10:20 a.m.

{34}    The evidence established that Officer Ruiloba stopped the first vehicle after it left the house at 10:10 a.m. and proceeded to Juan Tabo where it turned left. The vehicle then proceeded south on Juan Tabo until it reached a speed of forty-seven miles per hour and was paced at that speed for approximately three blocks by Officer Ruiloba before it was stopped for speeding. Officer Ruiloba then proceeded to issue a written warning citation to the driver for speeding and told him that he was free to go. As the driver was leaving, Officer Ruiloba asked him if he would continue to talk. After the driver agreed to talk, Officer Ruiloba asked questions about the contents of the vehicle and whether he could search the vehicle. The driver then gave written consent to search the vehicle. At that point, the officer located the box containing individual packages of marijuana and tested a package with a NIK test kit.

{35}    As Officer Ruiloba never testified at the suppression hearing, it was reasonable for the district court to infer that it took Officer Ruiloba more than ten minutes to effectuate all these tasks when he engaged and stopped the first vehicle and then tested the marijuana. As a result, knowledge of the contents and circumstances surrounding the stop of the first vehicle would not have been known to the Narcotics Unit when Defendant's vehicle left the house at 10:20 a.m. and was immediately stopped by Officer Westbrook. Because there was no confirming evidence that any of the marijuana had left the house with the first vehicle at the time Defendant's vehicle left at 10:20 a.m., the district court could reasonably find that the Narcotics Unit had no basis to infer that Defendant was taking one or more of the remaining two boxes to a secondary location when her vehicle left shortly after the departure

12

of the first vehicle. The contradictory inference made by the majority was unreasonable, inconsistent with the factual evidence, and contrary to our standard of review.

**{36}** The majority's interpretation or inference regarding the facts was not presented in a light most favorable standard of review to sustain the ruling of the district court. *See Neal*, 2007-NMSC-043, ¶ 15. The majority is now making an inference that is not in the record, was not made by the Narcotics Unit officers, and was not recognized by the district court. The testimony of Officer Westbrook and Detective Porter asserted no such inference and was never made as part of the record regarding Defendant's vehicle or any of its contents. In an effort to support its position regarding objective and particularized evidence to establish a reasonable suspicion to stop Defendant's vehicle, the majority is not only abandoning the standard of review, it has actually reversed the standard of review. The majority has now created its own new factual inference and has premised this new inference upon our right to put facts in their reasonable context under our de novo appellate standard of legal review that is utilized to define the constitutional context of police conduct. Majority Opinion, ¶ 21. The majority is asserting a view and interpretation of the facts in the light most favorable for reversal. I cannot support this improper view or characterization of the facts. No authority exists to support such a standard of review. Under the proper standard of review, no new inference in favor of the State can reasonably be assumed in this case. *See id.* Based upon the only particularized facts presented at the suppression hearing, Sergeant Christman and Detective Campbell issued directives to stop Defendant's vehicle when it left the Grand Avenue house, and these directives were based upon hunches, conjecture, and speculation about where the marijuana was located, what was in the first vehicle that left at 10:10 a.m., and what might be in the Ford Expedition when it left at 10:20 a.m. The nature of both traffic stops also supports this analysis of the facts. Neither driver was notified that a narcotics investigation or warrant was the basis for the stop. Instead, both vehicles were stopped for minor traffic violations. Objective and particularized reasonable suspicion of Defendant did not exist and was neither established by the evidence presented at the suppression hearing nor by the reasonable factual inferences in support of the district court ruling. The improper new inferences that have been made by the majority cannot be relied upon to establish reasonable suspicion in this case.

**Officer Westbrook's Traffic Stop was Pretextual**

**{37}** Without an independent basis for stopping Defendant's vehicle, we must determine whether Officer Westbrook's traffic-related stop of Defendant's vehicle was pretextual. In *Ochoa*, this Court departed from federal constitutional law and held that pretextual traffic stops violate Article II, Section 10 of the New Mexico Constitution. 2009-NMCA-002, ¶ 1. We defined a pretextual traffic stop as "a detention supportable by reasonable suspicion or probable cause to believe that a traffic offense has occurred, but [it] is executed as a pretense to pursue a 'hunch,' a different more serious investigative agenda for which there is no reasonable suspicion or probable cause." *Id.* ¶ 25. In determining whether a traffic stop was pretextual, we explained that the district court should first determine whether there was reasonable suspicion or probable cause for the traffic stop and then decide if the

13

officer's actual motive for the stop was unrelated to the justification for the stop. *Id.* ¶ 40. "The defendant has the burden of proof to show pretext based on the totality of the circumstances." *Id.* Once "the defendant shows sufficient facts indicating the officer had an unrelated motive that was not supported by reasonable suspicion or probable cause, then there is a rebuttable presumption that the stop was pretextual," at which point the burden shifts to the state to prove that the officer would have stopped the defendant even without the alternate motive. *Id.*

**{38}** The evidence established that both Sergeant Christman and Detective Campbell issued directives to stop Defendant's vehicle before Officer Westbrook left the staging area to immediately intercept and follow Defendant's vehicle. Detective Porter's Supplemental Report and Criminal Complaint both state that Officer Westbrook "stopped and detained [Defendant's vehicle] . . . as it was leaving the residence *to be searched*." (Emphasis added.) In his Supplemental Report, Officer Westbrook stated, "I was advised that a white Ford Expedition had exited the garage and was . . . leaving the residence. Det[ective] Campbell advised me to conduct a traffic stop on the vehicle." After engaging the vehicle and observing the two lane change violations, Officer Westbrook conducted his traffic stop. The majority recognized that if Officer Westbrook's motive for the stop was unrelated to the justification for the stop, then the stop was pretextual. Majority Opinion, ¶¶ 10-11. The district court found that sufficient evidence was presented to establish that the stop was pretextual because the motive for the stop was in fact unrelated to the lane change violations used to justify the stop. We must now address whether there was substantial evidence to sustain the ruling of the district court under our deferential standard of reviewing the evidence. *See Neal*, 2007-NMSC-043, ¶ 15 (noting that "we review the facts in the light most favorable to the . . . district court's factual findings so long as substantial evidence exists to support those findings").

**{39}** Substantial evidence was presented to support the district court's ruling that Officer Westbrook's stop of Defendant's vehicle was pretextual. Officer Westbrook was an assigned patrol officer to assist members of the Narcotics Unit. Immediately prior to the stop, Officer Westbrook was being briefed regarding his duties to provide perimeter security when the search warrant arrived to be served at the Grand Avenue house. The drug-related aspects of the search warrant were conveyed to Officer Westbrook by Detective Campbell. Officer Westbrook overheard the directive of Sergeant Christman to stop Defendant's vehicle over one of the Narcotics Unit radios. He was also given a second directive by Detective Campbell to stop Defendant's vehicle. Officer Westbrook immediately left the staging area and his previously assigned duties to intercept Defendant's vehicle on Juan Tabo and follow her down Juan Tabo until the ultimate traffic stop occurred several blocks later. After initiating the stop and undertaking a search of the box located in the rear compartment, Officer Westbrook left the scene and turned the matter over to other members of the Narcotics Unit. No traffic citations were issued by Officer Westbrook, and the vehicle was sealed until a search warrant was issued. The district court also found Officer Westbrook's testimony to be credible. Viewing the evidence in the required deferential light, there is sufficient evidence to affirm the district court's determination that Officer

Westbrook had an unrelated pretextual motive to stop Defendant's vehicle in order to investigate her involvement in drug activity at the Grand Avenue house. Officer Westbrook's underlying motive was not supported by reasonable suspicion or probable cause. In fact, this underlying motive was based upon the speculative hunches and unsupported conjecture of the members of the Narcotics Unit that were in charge of the Grand Avenue house surveillance and investigation.

{40}    Once Defendant presented substantial evidence that Officer Westbrook had the unrelated pretextual motive to stop the white Ford Expedition in order to investigate involvement in drug activity at the Grand Avenue house, the State bears the burden of rebutting this presumption. *Ochoa*, 2009-NMCA-002, ¶ 40. In this case, the State initially relied upon the testimony of Officer Westbrook in an attempt to rebut the presumption that his stop was pretextual. Officer Westbrook testified that he only considered the directives of Sergeant Christman and Detective Campbell to be a "request" rather than an order or command to stop Defendant's vehicle. However, at the second suppression hearing, the State changed its position and argued that the stop was based upon reasonable suspicion from the facts occurring at the Grand Avenue house. The State abandoned its argument that Officer Westbrook acted independently and only stopped Defendant because of his independent observations of the two minor lane change violations. The original testimony and record from the first suppression hearing was not supplemented by the State to support this new argument.

{41}    The district court was not convinced by the State's argument. We defer to the district court when it comes to weighing the evidence and the credibility of the witnesses. *Id.*; *see Jason L.*, 2000-NMSC-018, ¶ 10 (deferring to the district court's findings of facts). As the State abandoned its original argument in the district court, it is unnecessary for this Court to analyze Officer Westbrook's subjective understanding of the directive he received from his superior officers to stop Defendant's vehicle. The district court properly relied upon the objective factors establishing a pretextual motive and basis for the traffic stop. In this case, whether the commanding officers issued a command, an order, or a request to take action, the district court can give significant weight to the objective fact that Officer Westbrook followed the directive he was given. Officer Westbrook abandoned his previously assigned duties as part of the perimeter security team, immediately engaged and stopped the white Ford Expedition for minor traffic violations, and conducted the requested search of the vehicle. Despite the State's subsequent abandonment of its rebuttal argument, the district court did not err if it did exercise its discretion to reject the State's rebuttal argument regarding whether this particular stop was pretextual. When balancing the evidence, we defer to the district court when it weighs the evidence, assesses the witnesses, and determines the credibility to be assigned to the testimony presented. *See Neal*, 2007-NMSC-043, ¶ 15. As a result, I agree with the district court that the State either abandoned or failed to rebut the Defendant's prima facie evidence of a pretextual stop.

**Summation**

**{42}**     Finally, the State has asked this Court to reconsider its decision in *Ochoa*. Under the present circumstances and as the dissenting voice in this case, I decline the State's invitation to reconsider our holding in *Ochoa* at this time.  In summation, I do not concur with the result reached by the majority in this case.  The evidence seized during the pretextual traffic stop of Defendant's vehicle should be suppressed, and the district court's suppression order should be affirmed.

_____
**TIMOTHY L. GARCIA, Judge**

**Topic Index for *State v. Alderete*, Docket No. 29,214**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-RM | Remand |
| AE-SR | Standard of Review |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-CL | Controlled Substances |
| CL-MH | Motor Vehicle Violations |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-IR | Informer |
| CA-MR | Motion to Suppress |
| CA-PQ | Pretextual Stop |
| CA-RS | Reasonable Suspicion |
| CA-SZ | Search and Seizure |
| CA-WS | Warrantless Search |